Joseph C. DANIEL, Jr., et al.,
Plaintiffs-Appellants,

v.

Hugh WATERS, Chairman, Textbook Commission of the State of Tennessee, et al., Defendants-Appellees.

No. 74–2230.

United States Court of Appeals,
Sixth Circuit.

April 10, 1975.

Frederic S. LeClercq, Knoxville, Tenn., for plaintiffs-appellants.

Milton P. Rice, Atty. Gen. of Tenn., Nashville, Tenn., for defendants-appellees.

Before EDWARDS, CELEBREZZE and LIVELY, Circuit Judges.

EDWARDS, Circuit Judge.

We are confronted in this appeal by a 1974 version of the legislative effort to suppress the theory of evolution which

produced the famous *Scopes* "monkey trial" of 1925. *See* Scopes v. State, 154 Tenn. 105, 289 S.W. 363 (1927). In this instance the Tennessee Legislature has sought to avoid direct suppression of speech and has eschewed direct criminal sanctions. But the purpose of establishing the Biblical version of the creation of man over the Darwinian theory of the evolution of man is as clear in the 1973 statute as it was in the statute of 1925.

Plaintiffs are teachers of biology in Tennessee public schools, some of whom are also parents of public school students, plus the National Association of Biology Teachers. The defendants are members of the Tennessee state board which is charged with the responsibility of selecting public school textbooks. Jurisdiction is invoked under 28 U.S.C. § 1343(3) (1970).

The statute at issue, Chapter 377 of the 1973 Public Acts of Tennessee, is reproduced below. We have underlined the specific language which plaintiffs-appellants assert to be patently violative of the First and Fourteenth Amendments to the Constitution of the United States:

SECTION 1. Tennessee Code Annotated, Section 49–2008, is amended by adding the following paragraph:

Any biology textbook used for teaching in the public schools, which expresses an opinion of, or relates a theory about origins or creation of man and his world shall be prohibited from being used as a textbook in such system unless it specifically states that it is a theory as to the origin and creation of man and his world and is not represented to be scientific fact. Any textbook so used in the public education system which expresses an opinion or relates to a theory or theories shall give in the same text-book and under the same subject commensurate attention to, and an equal amount of emphasis on, the origins and creation of man and his world as the same is recorded in other theories, including, but not limited to, the Genesis account in the Bible. The

provisions of this Act shall not apply to use of any textbook now legally in use, until the beginning of the school year of 1975–76; provided, however, that the textbook requirements stated above shall in no way diminish the duty of the State Textbook Commission to prepare a list of approved standard editions of textbooks for use in the public schools of the state as provided in this section. Each local school board may use textbooks or supplementary material as approved by the State Board of Education to carry out the provisions of this section. The teaching of all occult or satanical beliefs of human origin is expressly excluded from this Act.

SECTION 2. Provided, however, that the Holy Bible shall not be defined as a textbook, but is hereby declared to be a reference work and shall not be required to carry the disclaimer above provided for textbooks.

SECTION 3. The provisions of this Act are hereby declared to be severable; and if any of its sections, provisions, clauses, or parts be held unconstitutional or void, then the remainder of this Act shall continue in full force and effect, it being the legislative intent now hereby declared that this Act would have been adopted even if such unconstitutional or void matter had not been included herein.

SECTION 4. This Act shall take effect upon becoming a law, the public welfare requiring it.

1973 Tenn.Pub.Acts, Chap. 377 (Emphasis added.)

On the filing of the complaint and a motion for a preliminary injunction in this case, the District Judge, presumably because the complaint alleged the unconstitutionality of a state statute of statewide application, initiated the convening of a three-judge court. (*See* 28 U.S.C. §§ 2281, 2284 (1970)).

The State of Tennessee then appeared and filed a motion noting that the same question was then pending in the Chan-

cery Court of Davidson County, Tennessee. Tennessee moved that the federal court dismiss the complaint, or' in the alternative, enter an order of abstention pending final state court adjudication.

Without a hearing and without reaching the merits, the three-judge court entered an order, taking notice of the state court litigation, abstaining from adjudication pending final disposition of same, but retaining jurisdiction of the case.

Plaintiffs-appellants thereupon filed a jurisdictional statement seeking an appeal to the United States Supreme Court. After a Supreme Court order for a response from the State and the filing of same, the following order was entered:

> The judgment is vacated and the case is remanded to the United States District Court for the Middle District of Tennessee so that it may enter a fresh judgment from which a timely appeal may be taken to the Court of Appeals.

Although a protective appeal had previously been timely filed with this court, the three-judge District Court reentered its order of February 26, 1974, and plaintiffs-appellants have filed notice of appeal, which appeal has now been briefed and argued before this court.

The parties have advised that on September 9, 1974, the Chancery Court of Davidson County, Tennessee, decided the case before it on the merits, holding that the statute attacked was in violation of the First and Fourteenth Amendments. The State has appealed, thereby suspending the effectiveness of the Circuit Court decree until the Supreme Court of Tennessee decides the case.

## ABSTENTION

■ Abstention is an appropriate response to a federal complaint alleging unconstitutionality of a state statute where state interpretation of its own ambiguous statute might serve to render it inoffensive to the federal Constitution. Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972).

■ The federal courts are not permitted otherwise, however, to shut their doors to a complaint of federal constitutional violation even if there is a possible state remedy which is being pursued. Home Telephone & Telegraph Co. v. City of Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed.2d 510 (1913); Kasper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965). In this last case the Supreme Court said:

> If the state statute in question, although never interpreted by a state tribunal, 'is not fairly subject to an interpretation which will render unnecessary' or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction. Baggett v. Bullitt, 377 U.S. 360, 375–379, [84 S.Ct. 1316, 1324–1326, 12 L.Ed.2d 377]. Thus, "recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law." England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 415–416 [84 S.Ct. 461, 465, 11 L.Ed.2d 440].

Harman v. Forssenius, *supra* at 534–35, 85 S.Ct. at 1182.

With these principles in mind, we turn to an examination of the statute itself against the federal constitutional principles which are relied upon.

## THE FIRST AMENDMENT

The First Amendment to the Constitution of the United States says in applicable part:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof;
>
> . . .

The Fourteenth Amendment to the Constitution of the United States says in applicable part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend XIV § 1.

We have previously indicated that the statute complained of does not directly forbid the teaching of evolution. It does, however, prohibit the selection of any textbook which teaches evolution unless it also contains a disclaimer stating that such doctrine is "a theory as to the origin and creation of man and his world and is not represented to be scientific fact." And the same statute expressly requires the inclusion of the Genesis version of creation (if any version at all is taught) while permitting that version alone to be printed without the above disclaimer. (Section 2 of the statute quoted above says: "Provided, however, that the Holy Bible shall not be defined as a textbook, but is hereby declared to be a reference work, and shall not be required to carry the disclaimer above provided for textbooks.") Furthermore, "the teaching of all occult or satanical beliefs of human origin is expressly excluded from this act," presumably meaning that religious beliefs deemed "occult" or "satanical" need not be printed in biology texts along with the other theories.

We believe that in several respects the statute under consideration is unconstitutional on its face, that no state court interpretation of it can save it, and that in this case, the District Court clearly erred in abstaining from rendering a determination of the unconstitutionality of the statute on its face.

First, the statute requires that any textbook which expresses an opinion about the origin of man "shall be prohibited from being used" unless the book specifically states that the opinion is "a theory" and "is not represented to be scientific fact." The statute also requires that the Biblical account of crea-

tion (and other theories of creation) be printed at the same time, with commensurate attention and equal emphasis. As to all such theories, except only the Genesis theory, the textbook must print the disclaimer quoted above. But the proviso in Section 2 would allow the printing of the Biblical account of creation as set forth in Genesis without any such disclaimer. The result of this legislation is a clearly defined preferential position for the Biblical version of creation as opposed to any account of the development of man based on scientific research and reasoning. For a state to seek to enforce such a preference by law is to seek to accomplish the very establishment of religion which the First Amendment to the Constitution of the United States squarely forbids.

We believe the provisions of the Tennessee statute are obviously in violation of the First Amendment prohibition on any law "respecting the establishment of religion" as that phrase has been authoritatively interpreted in Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), and Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

In *Epperson* the Supreme Court said:

In any event, we do not rest our decision upon the asserted vagueness of the statute. On either interpretation of its language, Arkansas' statute cannot stand. It is of no moment whether the law is deemed to prohibit mention of Darwin's theory, or to forbid any or all of the infinite varieties of communication embraced within the term "teaching." Under either interpretation, the law must be stricken because of its conflict with the constitutional prohibition of state laws respecting an establishment of religion or prohibiting the free exercise thereof. The overriding fact is that Arkansas' law selects from the body of knowledge a particular segment which it proscribes for the sole reason that it is deemed to conflict with a particular

religious doctrine; that is, with a particular interpretation of the Book of Genesis by a particular religious group.

\* \* \* \* \* \*

The antecedents of today's decision are many and unmistakable. They are rooted in the foundation soil of our Nation. They are fundamental to freedom.

Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice. It may not be hostile to any religion or to the advocacy of no-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.

As early as 1872, this Court said: "The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." Watson v. Jones, 13 Wall. 679, 728 [80 U.S. 679, 20 L.Ed. 666.] This has been the interpretation of the great First Amendment which this Court has applied in the many and subtle problems which the ferment of our national life has presented for decision within the Amendment's broad command.

Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. Our courts, however, have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief. By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. On the other hand, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," Shelton v. Tucker, 364 U.S. 479, 487 [81 S.Ct. 247, 251, 5 L.Ed.2d 231] (1960). As this Court said in Keyishian v. Board of Regents, the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." 385 U.S. 589, 603 [87 S.Ct. 675, 683, 17 L.Ed.2d 629] (1967).

There is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma. In Everson v. Board of Education, this Court, in upholding a state law to provide free bus service to school children, including those attending parochial schools, said: "Neither [a State nor the Federal Government] can pass laws which aid one religion, aid all religions, or prefer one religion over another." 330 U.S. 1, 15 [67 S.Ct. 504, 511, 91 L.Ed. 711] (1947).

At the following Term of Court, in McCollum v. Board of Education, 333 U.S. 203 [68 S.Ct. 461, 92 L.Ed. 649] (1948), the Court held that Illinois could not release pupils from class to attend classes of instruction in the school buildings in the religion of their choice. This, it said, would involve the State in using tax-supported property for religious purposes, thereby breaching the "wall of separation" which, according to Jefferson, the First Amendment was intended to erect between church and state. *Id.*, at 211 [68 S.Ct. 461 at 465]. See also Engel v. Vitale, 370 U.S. 421, 428 [82 S.Ct. 1261, 8 L.Ed.2d 601] (1962); Abington School District v. Schempp, 374 U.S. 203 [83 S.Ct. 1560, 10 L.Ed.2d 844] (1963). While study of religions and of the Bible from a literary and historic viewpoint, presented objectively as part of a secular program of education, need not collide with the First Amendment's prohibition, the State may not adopt programs or practices in its public schools or colleges which

"aid or oppose" any religion. *Id.,* at 225 [83 S.Ct. 1560, 1573]. This prohibition is absolute. *It forbids alike the preference of a religious doctrine or the prohibition of theory which is deemed antagonistic to a particular dogma.* As Mr. Justice Clark stated in Joseph Burstyn, Inc. v. Wilson, "the state has no legitimate interest in protecting any or all religions from views distasteful to them . . . ." 343 U.S. 495, 505 [72 S.Ct. 777, 782, 96 L.Ed. 1098] (1952). The test was stated as follows in Abington School District v. Schempp, *supra,* [374 U.S.] at 222 [83 S.Ct. at 1571]: "[W]hat are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution."

Epperson v. Arkansas, 393 U.S. 97, 103–05, 106–07, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). (Emphasis added.) (Footnotes omitted.)

In *Lemon* Chief Justice Burger said:

In the absence of precisely stated constitutional prohibitions, we must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: "sponsorship, financial support, and active involvement of the sovereign in religious activity." Walz v. Tax Commission, 397 U.S. 664, 668 [90 S.Ct. 1409, 1411, 25 L.Ed.2d 697] (1970).

Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243 [88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060] (1968); finally, the statute must not foster "an excessive government entanglement with religion." *Walz, supra,* [397 U.S.] at 674 [90 S.Ct. 1409, at 1414].

Lemon v. Kurtzman, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

▇ While the requirement of preferential treatment of the Bible clearly offends the Establishment Clause of the First Amendment, the exclusion at the end of Section 1 of the statute would inextricably involve the State Textbook Commission in the most difficult and hotly disputed of theological arguments in direct conflict with Chief Justice Burger's third standard. Throughout human history the God of some men has frequently been regarded as the Devil incarnate by men of other religious persuasions. It would be utterly impossible for the Tennessee Textbook Commission to determine which religious theories were "occult" or "satanical" without seeking to resolve the theological arguments which have embroiled and frustrated theologians through the ages.[1]

The requirement that some religious concepts of creation, adhered to presumably by some Tennessee citizens, be excluded on such grounds in favor of the Bible of the Jews and the Christians represents still another method of preferential treatment of particular faiths by state law and, of course, is forbidden by the Establishment Clause of the First Amendment.

We deem the two constitutional violations described above to be patent and obvious on the face of the statute and impossible for any state interpretation to cure. Under these circumstances, we find no need to determine whether the terms "occult" and "satanical" are, as claimed by appellants, also void for vagueness under the Due Process Clause of the Fourteenth Amendment. Nor for

---

1. See "Satan" and "satanical," 9 Oxford Eng. Dict. 116 (1933), and W. Woods, A History of The Devil (1973) to note how frequently differences of religious opinions are accompanied by denunciation employing the terms "Satan" or "the devil."

the same reason do we feel it is necessary or desirable to pass on appellants' claims that the statute as drawn represents violation of the Freedom of Speech and Press Clauses of the First Amendment.

### RELIEF

■ We have examined with interest the order entered by the Supreme Court, along with the jurisdictional statement filed by Tennessee in the Supreme Court and the response thereto filed by the plaintiffs. We believe that the order can properly be interpreted as indication that no three-judge District Court was necessary in this action under 28 U.S.C. § 2281 (1970) because, as we have determined above, this state statute is patently unconstitutional. *See* Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962), and Turner v. City of Memphis, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962).

We particularly note the similarity between the language vacating and remanding employed by the Supreme Court in Pennsylvania Public Utility Commission v. Pennsylvania Railroad Co., 382 U.S. 281, 86 S.Ct. 423, 15 L.Ed.2d 324 (1965), and the order entered in this case.

It may, however, be argued (as does the dissent) that the Supreme Court order might be interpreted as a holding that the Supreme Court lacked jurisdiction over a direct appeal from the order of abstention entered by the three-judge court in this case because the order was interlocutory and not one granting or denying preliminary injunctive relief. *See, e. g.,* MTM, Inc. v. Baxley, —— U.S. ——, 95 S.Ct. 1278, 43 L.Ed.2d 636 (1975); Gonzalez v. Automatic Employees Credit Union, 419 U.S. 90, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974); Goldstein v. Cox, 396 U.S. 471, 90 S.Ct. 671, 24 L.Ed.2d 663 (1970); Rockefeller v. Catholic Medical Center, 397 U.S. 820, 90 S.Ct. 1517, 25 L.Ed.2d 806 (1970). As we see the matter, however, the abstention order did in effect deny preliminary injunctive relief and effectively shut the federal court-house door upon plaintiffs in their search for timely vindication of their federal constitutional claims.

■ Such a denial of federal adjudication is peculiarly inappropriate when the constitutional claim rests upon the First Amendment to the United States Constitution. In a First Amendment case the United States Supreme Court noted:

> In such a case to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect. *See* Dombrowski v. Pfister, 380 U.S. 479, 486–487 [85 S.Ct. 1116, 1120–1121, 14 L.Ed.2d 22]; Baggett v. Bullitt, *supra,* at 378–379 [377 U.S. 360 84 S.Ct. 1316, at 1326, 12 L.Ed.2d 377 (1964)]; NAACP v. Button, *supra,* at 433 [371 U.S. 415 83 S.Ct. 328, at 338, 9 L.Ed.2d 405 (1963)]; *Cf.* Garrison v. Louisiana, 379 U.S. 64, 74–75 [85 S.Ct. 209, 215–216, 13 L.Ed.2d 125]; Smith v. California, 361 U.S. 147 [80 S.Ct. 215, 4 L.Ed.2d 205].

> Zwickler v. Koota, 389 U.S. 241, 252, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967).

The judgments of the District Court are vacated and the case is remanded for entry of an order dissolving the three-judge court and an order by the District Judge before whom the case was filed granting preliminary injunctive relief in accordance with this opinion.

CELEBREZZE, Circuit Judge (dissenting).

I respectfully dissent because I do not interpret the Supreme Court's remand order as a holding that Tennessee's biology textbook law is patently unconstitutional. The Supreme Court's order was as follows:

> The judgment is vacated and the case is remanded to the United States District Court for the Middle District of Tennessee so that it may enter a fresh judgment from which a timely appeal may be taken to the Court of Appeals.

This is not a holding that "no three-judge District Court was necessary . . . because this state statute is patently unconstitutional," as the majority interprets the remand order. Had the Supreme Court meant that, it would have said so and would have remanded "to the District Court with directions to enter a decree granting appropriate injunctive relief," as it did in Turner v. City of Memphis, 369 U.S. 350, 354, 82 S.Ct. 805, 807, 7 L.Ed.2d 762 (1962), and Bailey v. Patterson, 369 U.S. 31, 34, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962), the cases the majority cites in support of its view. Furthermore, if this view of the Supreme Court's order is valid, the majority's discussion of the merits of the Tennessee statute is pure surplusage.

I believe that the proper interpretation of the Supreme Court's remand order is that this Court, rather than the Supreme Court, should review the merits of the three-judge District Court's abstention order. Under 28 U.S.C. § 1253 (1970), the Supreme Court does not have jurisdiction to review abstention orders of three-judge district courts which do not grant or deny interlocutory or permanent injunctive relief. Section 1253 allows a party to appeal an order from a three-judge district court to the Supreme Court only if it is an "order granting or denying . . . an interlocutory or permanent injunction." The abstention order appealed from does not grant or deny injunctive relief; it merely postpones decision, without dismissing the complaint. Thus, this case is within a growing line of decisions where the Supreme Court has denied its jurisdiction over appeals from orders of three-judge district courts. *See* Gonzalez v. Automatic Employees Credit Union, 419 U.S. 90, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974); McCann v. Babbitz, 400 U.S. 1, 91 S.Ct. 12, 27 L.Ed.2d 1 (1970); Gunn v. University Committee, 399 U.S. 383, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970); Mitchell v. Donovan, 398 U.S. 427, 90 S.Ct. 1763, 26 L.Ed.2d 378 (1970); Rockefeller v. Catholic Medical Center, 397 U.S. 820, 90 S.Ct. 1517, 25 L.Ed.2d 806 (1970); Wilson v. City of Port Lavaca, 391 U.S. 352, 88 S.Ct. 1502, 20 L.Ed.2d 636 (1968). *See also* Thoms v. Heffernan, 473 F.2d 478 (2d Cir. 1973), rev'd on other grounds, 418 U.S. 908, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974).

The appeal falls within the rule announced in Goldstein v. Cox, 396 U.S. 471, 90 S.Ct. 671, 24 L.Ed.2d 663 (1970), that an order of a three-judge district court which falls short of adjudicating the constitutional merits of a challenged statute and does not grant or deny *preliminary* injunctive relief is not appealable to the Supreme Court. Rather, the relevant Court of Appeals must review the appeal's merits. *See also* Hutcherson v. Lehtin, 399 U.S. 522, 90 S.Ct. 2238, 26 L.Ed.2d 781 (1970), where the Supreme Court remanded for consideration by the Ninth Circuit of an appeal of a three-judge district court order which had abstained from considering one aspect of the plaintiffs' constitutional attack on a state statute (313 F.Supp. 1324 (N.D.Cal. 1970)). Here the District Court took no action on Appellants' motion for preliminary and permanent injunctive relief, so that Goldstein v. Cox required the Supreme Court to remand the appeal to this Court[1].*

The language used by the Supreme Court has been standard for several years

---

1. It would have been desirable for the Supreme Court to have explained its action more fully. This appears to be the first instance where the Supreme Court has declined jurisdiction over an appeal of an abstention order of a three-judge district court. The *Hutcherson* case involved abstention in part but also concerned other rulings by the district court.

* While this opinion was at the printer's, the Supreme Court held in MTM, Inc. v. Baxley, —— U.S. ——, 95 S.Ct. 1278, 43 L.Ed.2d 636 (1975), that "a direct appeal will lie to this Court under § 1253 from the order of a three-judge federal court denying interlocutory or permanent injunctive relief only where such order rests upon resolution of the merits of the constitutional claim presented below." This holding makes crystal clear that we, rather than the Supreme Court, have jurisdiction to hear the appeal of the three-judge court's abstention order.

when remanding appeals from three-judge district courts on the ground that they lack jurisdiction under 28 U.S.C. § 1253. See 9 J. Moore, Federal Practice 79 (2d ed. 1973). I do not believe that we are in a procedural quagmire, as the majority suggests exists. The Supreme Court simply directed that this Court, rather than itself, hear the appeal of the abstention order. We should do so.[2]

Having jurisdiction over the abstention order's validity, we might rest our decision on a ground not briefed or argued by the parties—that the three-judge district court should have held that the case involves "no substantial constitutional claim," and therefore should have dissolved itself for want of jurisdiction under 28 U.S.C. § 2281 (1966). Had this happened, the single district judge would have entered appropriate relief based on the holding that the Tennessee statute is patently unconstitutional on its face. This is the ground on which the majority rests its decision.

I cannot concur. The constitutional issue in this case is not "wholly insubstantial" for the purpose of determining whether a three-judge district court is necessary under § 2281.

A reading of Goosby v. Osser, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973), reveals a strict standard for refusing to convene a three-judge district court on the ground that the constitutional issue involved is insubstantial.[3] In Goosby, the Supreme Court unanimously held:

Title 28 U.S.C. § 2281 does not require the convening of a three-judge court when the constitutional attack upon the state statutes is insubstantial. "Constitutional insubstantiality" for this purpose has been equated with such concepts as "essentially fictitious," Bailey v. Patterson, 369 U.S., at 33, 82 S.Ct. [549] at 551, 7 L.Ed.2d 512; "wholly insubstantial," ibid.; "obviously frivolous," Hannis Distilling Co. v. Baltimore, 216 U.S. 285, 288, 30 S.Ct. 326, 327, 54 L.Ed. 482 (1910); and "obviously without merit," Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 4–5, 78 L.Ed. 152 (1933). The limiting words "wholly" and "obviously" have cogent legal significance. In the context of the effect of prior decisions upon the substantiality of constitutional claims, those words import that claims are constitutionally insubstantial only if the prior decisions inescapably render the claims frivolous; previous decisions that merely render claims of doubtful or questionable merit do not render them insubstantial for the purposes of 28 U.S.C. § 2281. A claim is insubstantial only if " 'its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.' " 409 U.S. at 518, 93 S.Ct. at 858.

The Goosby plaintiffs had attacked as unconstitutional a Pennsylvania statute which allegedly prohibited persons jailed

---

2. An abstention order is appealable to this Court under 28 U.S.C. § 1291 (1966). Idlewild Liquor Corp. v. Epstein, 370 U.S. 713, 715 n. 2, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962); Druker v. Sullivan, 458 F.2d 1272, 1274 n. 3 (1st Cir. 1972).

We have jurisdiction over this appeal from a three-judge district court because its order is not appealable directly to the Supreme Court. Section 1291 extends our jurisdiction to all district court appeals "except where a direct review may be had in the Supreme Court."

3. Goosby has caused other circuits to restrict dismissals of complaints by single-judge district courts on the ground that constitutional issues are insubstantial. See, e. g., Roe v. In-

graham, 480 F.2d 102 (2d Cir. 1973) (reversing dismissal of complaint and remanding for three-judge court consideration, citing the "strict test" of Goosby). Contrast the pre-Goosby decision in Johnson v. New York State Education Department, 449 F.2d 871 (2d Cir. 1971) (with strong dissent), vacated, 409 U.S. 75, 93 S.Ct. 259, 34 L.Ed.2d 290 (1972). Likewise, the Third Circuit, whose Goosby decision, 452 F.2d 39 (3d Cir. 1971), was reversed, has recognized that the Supreme Court "has interpreted the requirement for a substantial federal question liberally" since Goosby. Farley v. Farley, 481 F.2d 1009, 1011 (3d Cir. 1973); Rowland v. Tarr, 480 F.2d 545 (3d Cir. 1973).

before trial from voting. The Third Circuit affirmed the dismissal of the complaint by a single district judge, citing McDonald v. Board of Election Comm'rs, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969), where the Supreme Court had upheld the constitutionality of an Illinois statute denying absentee ballots to pretrial detainees. The Supreme Court reversed the Third Circuit, holding that *McDonald* merely upheld the right of a state to limit access to its absentee ballot procedures. The *Goosby* complaint alleged that Pennsylvania pretrial detainees were *absolutely* prevented from voting. This was a different case, said the Supreme Court, at least for the purpose of determining whether a three-judge court should have been convened.

The Tennessee biology textbook statute is different from the laws challenged in Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), and Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 725 (1971), contrary to the holding of the majority. *Epperson* overturned a statute which made it unlawful for a publicly employed teacher to teach the theory of Darwinian evolution. The Tennessee statute, by contrast, contains no criminal sanctions and prescribes that religious theories of evolution and the creation *be included* in the teaching of biology. Thus, it cannot be said that *Epperson* "leave[s] no room for the inference that the question sought to be raised [by Appellees] can be the subject of controversy." *Goosby*, 409 U.S. at 519, 93 S.Ct. at 859.

Likewise, Lemon v. Kurtzman does not foreclose inquiry into Appellees' defense of the Tennessee statute. *Lemon*, itself a case provoking five separate opinions, struck down certain state statutes authorizing the expenditure of public funds for particular kinds of support to nonpublic schools. As this Court held in Protestants and Other Americans United v. United States, 435 F.2d 627 (6th Cir. 1970), cert. denied, 403 U.S. 955, 91 S.Ct. 2277, 29 L.Ed.2d 865 (1971):

The decisions of the Supreme Court construing the Free Exercise and Establishment Clauses of the First Amendment have drawn fine distinctions and have laid down rules not easy to apply. They have been decisions by divided courts. 435 F.2d at 630.

Accordingly, we held in *Protestants* that a substantial question was presented by a complaint and that a three-judge district court should have been convened to consider it. The complaint attacked the constitutionality of a federal statute which authorized "the loaning of library books and materials directly to the parochial schools, rather than the issuing of textbooks directly to the school children," the latter procedure having been upheld in Board of Education of Central School District No. 1 v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

It is impossible satisfactorily to reconcile our holding in *Protestants* with the decision here. *See also* Anderson v. Richardson, 454 F.2d 596 (6th Cir. 1972). Like *Epperson, Lemon* does not foreclose all argument that the Tennessee statute, or a part thereof, is constitutional, at least within the strict test set forth in *Goosby*. The "establishment" and "entanglement" issues are not "fictitious" or "frivolous." They deserve consideration by a three-judge district court. They warrant more than the cursory briefing and argument which the parties gave them on this appeal, since the basic issues briefed before us were those of jurisdiction and abstention. Indeed, the three-judge District Court itself, which had the benefit of briefing, stated that it was not "persuaded that the [statute] is clearly lacking in constitutional validity."

The majority's decision not only violates the rule set forth in *Goosby*, but it does not accord with the basic Congressional purpose behind the three-judge court statutes. That purpose was succinctly stated by Mr. Justice Frankfurter in Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800 (1941):

The crux of the business is procedural protection against an improvident state-wide doom by a federal court of a state's legislative policy.

Through the three-judge district court procedure Congress intended to limit the power of single district judges to enjoin the operation of state laws.[4]

In *Goosby*, the single judge's decision had been to dismiss the complaint, thus not infringing the basic purpose behind section 2281. Its decision was nonetheless reversed.

Here, however, the majority orders a single judge to enjoin the operation of a statute. The law may or may not require that the Tennessee statute not be enforced. The law does require that a three-judge district court be convened to make that determination. A three-judge court determination is needed "to allow a more authoritative determination and less opportunity for individual predilection in sensitive and politically emotional areas." Swift & Co. v. Wickham, 382 U.S. 111, 119, 86 S.Ct. 258, 263, 15 L.Ed.2d 194 (1965). *Cf.* Potter v. Meier, 458 F.2d 585, 588–89 (8th Cir. 1972). Given the slightest room for argument that prior decisions of the Supreme Court do not foreclose the possibility that the Tennessee statute, or a part thereof, is constitutional, the three-judge district court should have been allowed to determine its validity.[5]

I have found only a handful of cases where the Supreme Court or a Circuit Court has affirmed or ordered the entry of injunctive relief against the operation of a state law by a single district judge on the ground that the statute lacked even a colorable claim of constitutional validity (the *Bailey* principle).

The most prominent instance involves state laws mandating racial segregation, in the face of Supreme Court decisions which "foreclosed as a litigable issue" the validity of segregative statutes. Bailey v. Patterson, 369 U.S. 31, 33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); City of New Orleans v. Barthe, 376 U.S. 189, 84 S.Ct. 636, 11 L.Ed.2d 602 (1964); Turner v. City of Memphis, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962); Evers v. Jackson Municipal Separate School District, 328 F.2d 408 (5th Cir. 1964); Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963); City of New Orleans v. Adams, 321 F.2d 493 (5th Cir. 1963); United States v. City of Jackson, 318 F.2d 1 (5th Cir. 1963); Potts v. Flax, 313 F.2d 284 (5th Cir. 1963); Meredith v. Fair, 305 F.2d 343 (5th Cir.), cert. denied, 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed.2d 66 (1962); Christian v. Jemison, 303 F.2d 52 (5th Cir. 1962).

---

4. For a discussion of the history of the three-judge court statutes, *see* C. Wright, Federal Courts § 50 (1963); Hutcheson, "A Case for Three Judges," 47 Harv.L.Rev. 795 (1934).

The resentment which action by single judges had engendered before the enactment of section 2281 is evident in the remarks of Senator Overman of North Carolina during the debates on that section:

"I saw in Moody's Magazine last week that there are 150 cases of this kind now where one federal judge has tied the hands of the state officers, the governor, and the attorney general. . . . My experience is that the state is sometimes delayed a solid year in collecting taxes. . . . Whenever one judge stands up in a State and enjoins the governor and the attorney-general, the people resent it, and public sentiment is stirred, as it was in my State, and you find the people of the State rising up in rebellion." 45 Cong.Rec. 7256 (1910).

5. The majority's decision leaves substantial doubt as to exactly what parts of the Tennessee statute are unconstitutional. The majority finds that the proviso in section 2 which excepts the Holy Bible from the requirement that accounts of the creation carry disclaimers of scientific accuracy violates the establishment clause of the First Amendment. The statement at the end of section 1 that "the teaching of all occult or satanical beliefs of human origins" need not be included in biology textbooks is found condemned by the "excessive entanglement" principle. With these two items removed from the statute, the majority's opinion gives no guidance to the single judge who is instructed to grant "preliminary injunctive relief in accordance with this opinion." Whether he is to enjoin operation of the entire statute or to prohibit particular actions based on particular objectionable sections is unclear. This is true despite a severability clause in the Tennessee statute which leaves operable any provision which is not held to be unconstitutional.

A second use of the *Bailey* principle occurred in Alabama Civil Liberties Union v. Wallace, 456 F.2d 1069 (5th Cir. 1972), where the Fifth Circuit affirmed an injunction issued by a single district judge against enforcement of a statute requiring Bible reading in the public schools, in explicit contravention of School District of Abington v. Schemp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

A third instance involved the reversal of a single judge's denial of relief from the operation of a statute making it a misdemeanor to print or circulate "any notice . . . that a boycott or ban exists or has existed or is contemplated against any person, firm, corporation, or association of persons doing a lawful business." The Fifth Circuit found "legion" support for its decision that the statute was overbroad on its face and cited Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), which had held a nearly identical companion statute unconstitutionally vague. Kirkland v. Wallace, 403 F.2d 413 (5th Cir. 1968). The decision provoked a strong dissent. 403 F.2d at 417–25.

The fourth and only other use of the *Bailey* principle by a Circuit Court involved an attack on Arizona's vagrancy statute. The Ninth Circuit held that Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), which had overturned a nearly identical vagrancy law, governed the case. Anderson v. Nemetz, 474 F.2d 814 (9th Cir. 1973). The Ninth Circuit pointed out that the state defendants conceded that the statute was constitutionally indefensible and were merely contesting standing and abstention issues.

None of these cases, supports the majority. The *Bailey* principle was meant to be confined to instances where the defense of a statute would raise only "frivolous" or "fictitious" constitutional arguments. Gong v. Kirk, 375 F.2d 728, 729 n. 2 (5th Cir. 1967); Trombetta v.

State of Florida, 339 F.Supp. 1359, 1362 (M.D.Fla.1972). Professor Currie, whose article "The Three-Judge District Court in Constitutional Litigation," 32 U.Chi.L. Rev. 1 (1964), remains the classic work on the subject, warned that "the [*Bailey*] principle is a violatile one that ·could easily get out of control." [6]

This Circuit has previously noted the drain placed on judicial resources by the three-judge court statutes. Jones v. Branigin, 433 F.2d 576 (6th Cir. 1970), cert. denied, 401 U.S. 977, 91 S.Ct. 1205, 28 L.Ed.2d 327 (1971). But this Circuit has always followed procedures mandated by Congress. *See Protestants, supra* ; Anderson v. Richardson, 454 F.2d 596 (6th Cir. 1972). The three-judge court procedures sometimes lead to futile procedural remands and to consideration by three judges of issues a single judge can easily decide. *See* Farley v. Farley, 481 F.2d 1009, 1012 (3d Cir. 1973). The remedy, however, is up to Congress. I would apply section 2281 in its present form and under its current interpretation by the Supreme Court. I would not order the process Congress has mandated for this case to be short-circuited in the manner the majority prescribes.

Because I am in dissent, there is no need to explain in depth my view of the basic issue presented by this appeal— whether the District Court erred in abstaining from decision on the merits of Appellants' claims. Simply stated, my position is that the District Court erred in abstaining because no state court construction of state law could avoid ultimate decision of the constitutional issues presented by the Tennessee statute. However narrowly the Tennessee Supreme Court might confine the statute's reach, its basic thrust must remain. Its central core is review by the Tennessee Textbook Commission to see that biology textbooks carry scientific disclaimers as to any particular theory of creation and evolution and that biology textbooks contain religious accounts of the creation and evolution. Whether the entangle-

---

6. 32 U.Chi.L.Rev. at 66. *See also* Note, "The Three-Judge District Court: Scope and Proce-

dure under *Section 2281*," 77 Harv.L.Rev. 299, 315 (1963).

ment that must result between government and religion will exceed the permissible degree is a question that must ultimately be faced. *See Protestants,* 435 F.2d at 630.

Abstention is therefore improper. Harman v. Forssenius, 380 U.S. 528, 534–35, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Baggett v. Bullitt, 377 U.S. 360, 375–79, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). The fact that a state constitutional provision might also decide the case does not warrant abstention, because the state provision here is substantially similar to the federal First Amendment. Carden v. Bland, 199 Tenn. 665, 672, 288 S.W.2d 718 (1956). Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

The case on which the District Court relied to justify abstention, Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), does not apply to this dispute. In *Reetz* the basic issue concerned management of natural resources, which the Supreme Court stated was "a matter of great state concern." 397 U.S. at 87, 90 S.Ct. at 790. Furthermore, the Supreme Court held that the Alaskan Constitution, which deals in detail with fishery rights and private interests, might be "the nub of the whole controversy." 397 U.S. at 87, 90 S.Ct. at 790. Thus, *Reetz* is a far different case from ours, where the challenged state statute is attacked on essentially one ground— conflict with the constitutional clause guaranteeing freedom of exercise and freedom from establishment of religion.

The District Court should have proceeded to adjudicate Appellants' claim on the merits.

Were this Court to reverse the abstention order, it could only remand for consideration of the merits of the statute by the three-judge District Court. As the Supreme Court held in *Goosby,* 409 U.S. at 522 n. 8, 93 S.Ct. 854, 35 L.Ed.2d 36 once it is determined that a claim is properly one for a three-judge court to

decide, the jurisdiction of the Court of Appeals ends. We are without jurisdiction to consider the merits of Appellants' constitutional contentions, and I intimate no view about them.

In summary, I believe that the Supreme Court's remand order meant only one thing—that this Court should decide the merits of the District Court's abstention order. The constitutional issues concerning the Tennessee statute are not "frivolous" or "fictitious." They merit consideration by a three-judge district court, as required by 28 U.S.C. § 2281. The District Court should not have abstained, but should have promptly adjudicated Appellants' claim. Thus, we should reverse the District Court's order and remand for consideration of the merits of the Tennessee statute. We have no jurisdiction to decide the constitutional issues ourselves.